Edward CAFFEE, Appellant,

v.

The Honorable Richard SCHWEIKER, Secretary of Health and Human Services, Appellee.

No. 84–5266.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit Rule 12(6).

Dec. 4, 1984.

Decided Jan. 15, 1985.

Constance J. Kosuda, Joel Solow, Freeman & Bass, Newark, N.J., for appellant.

W. Hunt Dumont, U.S. Atty., Edward G. Spell, Asst. U.S. Atty., Newark, N.J., for appellee.

Before ALDISERT, Chief Judge, BECKER, Circuit Judge, and CAHN, District Judge.*

**OPINION OF THE COURT**

BECKER, Circuit Judge.

This is an appeal from an order of the district court granting judgment for the

Secretary of Health and Human Services, thereby affirming the Secretary's order denying Social Security disability benefits and supplemental security income to appellant Edward L. Caffee.[1] For the reasons that follow, we reverse and remand, directing an award of benefits.

I.

Appellant is a 46 year-old former attendant in a New Jersey state mental hospital where he worked for over 20 years. Appellant's duties required him, inter alia, to perform physical work, including washing, positioning and sometimes lifting patients, occasionally violent ones. Appellant is a high school graduate with only a borderline I.Q.;[2] he has been unable to work since 1979 due to psychiatric and orthopedic problems.

The Secretary concedes that appellant cannot perform his former work, that he cannot engage in even moderate lifting, and that he cannot perform work involving stress or extensive contact with others. Therefore our inquiry focuses upon whether the Secretary has met her burden of proof, see *Rossi v. Califano*, 602 F.2d 55 (3d Cir.1979), that appellant has the residual functional capacity to perform sedentary work that is available in sufficient numbers in the national economy. Because the case-dispositive analysis lies in the area of the

---

* Honorable Edward N. Cahn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. The appellant filed applications for disability benefits and supplemental security income in September 1979 and May 1980. These applications were denied initially and on reconsideration. The appellant requested and was granted a hearing to review the decisions. The administrative law judge before whom the appellant appeared on November 17, 1980, considered the case *de novo*. In a written opinion dated May 13, 1983, the ALJ found that the appellant was not disabled. Plaintiff appealed, and the United States District Court for the District of New Jersey remanded the case to the Secretary for further administrative action for the purpose of obtaining recent psychiatric·and medical examination records. Therefore, the Appeals Council,

on August 27, 1982, vacated its denial of the plaintiff's decision and remanded this case to an ALJ for further proceedings including a supplemental hearing. The supplemental hearing was held on January 17, 1983. The ALJ before whom appellant appeared considered the case *de novo* and on May 26, 1983, in a recommended decision, found that appellant was not under a disability. The recommended decision of the ALJ was approved by the Appeals Council on August 29, 1983. On appeal, the district court further considered the matter and by Order and Opinion dated March 30, 1984, affirmed the decision of the Secretary.

2. Appellant's verbal I.Q. is 85. His performance on the standard tests is even poorer: calculation—85 (below 15th percentile); written language—78 (7th percentile); reading—84 (14th percentile).

evidence pertaining to appellant's psychiatric condition and, more specifically, his ability to work in potentially competitive situations, we will confine our discussion to that evidence.[3]

### A.

Appellant's mental problems first surfaced in 1975 when he was admitted to a Veteran's Hospital. He showed paranoid delusions and was released with a diagnosis of psychotic depressive reaction. For the next few years appellant was treated as an outpatient and was found consistently to be depressed and to have flat affect. He was found to be in contact with reality, but also to be paranoid, and often delusional. The diagnosis was post-psychotic depressive reaction.

Moving ahead to the period 1979 to 1982, the record reflects that appellant was treated and/or evaluated by a number of physicians. Because their reports form an important part of the record considered by the ALJ, we briefly summarize their salient conclusions.

Dr. Malcolm Hermele, a specialist in internal medicine, examined appellant in June 1979. He concluded that appellant had chronic bronchitis and fibrosis from which he was thirty percent disabled but that he was probably totally disabled from the psychiatric standpoint.

Dr. Robert Latimer, a psychiatrist, examined appellant on September 25, 1979, concluding that he was still suffering a psychotic episode. Dr. Latimer was unable to tell on one examination whether appellant suffered from a psychotic depression or a schizophrenic process but concluded that he was seriously disabled and could not function. Dr. Latimer thought that appellant might have been hallucinating during the interview.

In May of 1980 appellant was seen at the Harrison S. Martland Hospital of the College of Medicine and Dentistry of New Jersey on an emergency basis as a result of an injury to his elbow. *See supra* note 3. While hospitalized, a psychiatric consultation was requested because of appellant's mood and abnormal behavior. The psychiatric evaluator concluded that appellant was suffering from paranoid schizophrenia and prescribed thorazine.

Appellant was seen by another psychiatrist, Dr. Berkelhammer, on March 9, 1981, at the request of the New Jersey Department of Labor and Industry, Division of Disability Determinations. Dr. Berkelhammer concluded that appellant was suffering from residual schizophrenia. He opined that appellant conceivably could be employable in situations in which he would not feel any pressure. Dr. Berkelhammer added that any type of job in which there was going to be a large amount of interaction with other people would be beyond appellant's capacity to handle.

Appellant was also seen, at the request of the Division of Disability Determinations, by a clinical psychologist, Dr. Norman Hymowitz. Dr. Hymowitz administered a full range of psychological testing and concluded that appellant was of borderline intelligence, was somewhat depressed. He also found it difficult to determine how appellant would react to the pressures of work in the future. Dr. Hymowitz observed that appellant was "lucent [sic] and coherent," that he was capable of managing funds, and that "[w]ith supportive counselling and treatment, [he] may be able to return to the work setting and live a productive life." Explaining further, in a supplemental assessment, Dr. Hymowitz stated that appellant was "capable of functioning adequately in a setting which is not too demanding or competitive." Dr. Hymowitz also stressed the necessity of support from a therapist or social agency to enable appellant to adjust adequately.

Appellant was also subjected to psychological testing by Dr. Frank J. Dyer, who concluded that appellant's prospect for suc-

---

**3.** Appellant also suffers from post fracture joint disability of the right elbow, arthritis of the neck and back and sciatic neuritis of the right leg, but they only disable him for medium to heavy work.

cess would be limited because of his low academic, verbal, and mathematical achievement and that he could not perform the majority of administrative, secretarial, clerical, or computer-related jobs. Dr. Dyer also noted that appellant's total testing time was extremely high, reflecting a compulsive and anxious approach to tasks. Dr. Dyer found appellant to be in the borderline intelligence range.

Finally, appellant was evaluated for the Division of Disability Determinations by Dr. Talaxi Shah, a psychiatrist; the ALJ's opinion depends a good deal upon Dr. Shah's report. Dr. Shah noted that appellant was suffering from mild depression but was not suicidal. He noted no paranoia. He observed that appellant's contact with reality was good, that he had "partial insight into his difficulties," that his judgment was by and large "normal" and that he did not demonstrate any bizarre behavior but rather was able to relate fairly well to the doctor. He did find that appellant's responses were slow. He diagnosed appellant as suffering from a "dysthymic disorder," and opined that appellant was able to handle his own funds. However, qualifying his other opinions, Dr. Shah concluded with the following statement:

> "The plaintiff should see a medical doctor for his multiple aches and pains and should go to the nearest mental health center and try to get some help for his anxiety and depression. Rehabilitation counselling is absolutely in order, without which the prognosis is guarded."

## B.

It is crystal clear from the foregoing medical survey that appellant has in the past suffered from a severe psychiatric disorder and that, at minimum, he still suffers from its residual effects. It is also beyond

question that appellant can function in a work environment only if that environment is free from all stress and competition. Apparently recognizing this, the ALJ called a vocational expert, Ana Mooney, whose critical conclusions we now will summarize.

Mrs. Mooney opined that at most appellant could work on a sedentary unskilled level. She then listed four jobs that she believed he could perform: ampoule sealer, frame coverer, lens insert worker, and acetone button paster. Mrs. Mooney added that these jobs exist in substantial numbers in the national and local economy. She was then asked:

> "Q. Would you say that there's pressure in these jobs?
>
> A. There's no job without pressure." 294a.

The examination continued on this line as follows:

> "Q. Is there a production level that is generally required for employees who have those jobs?
>
> A. Even employees who work at a bench in a factory on straight time have production quotas." 295a.

Appellant's counsel attempted to pursue this line of questioning but was cut off by the ALJ. However, after the hearing was concluded, in order to "further clarify the case," the ALJ submitted a written interrogatory to Mrs. Mooney referring to the jobs that she had enumerated during her testimony.[4] Mrs. Mooney's answers were as follows:

> Q. 1. Assume that the claimant was capable of fine and gross manipulations of both hands and his right arm was minimally limited in extension, could he still perform the jobs enumerated by you?
>
> A. Yes.

4. Appellant's counsel has strenuously objected to this procedure and requested the opportunity to cross-examine the vocational expert. In view of the rather peremptory truncation of counsel's cross-examination of Mrs. Mooney, the procedure adopted by the ALJ strikes us as less than a model of fairness. However, since counsel did have the opportunity to conduct some cross-examination of the expert on the relevant points and since we decide the case on other grounds, it is not necessary to address this contention, except that we note our concern as to the appearance of lack of even-handedness which the practice would appear to create, at least in this case.

Q. 2. Assume that the claimant was totally unable to use his right hand/arm. Are there sedentary, unskilled jobs he could perform which exist in significant numbers in the national economy? If so, please enumerate them.

A. Yes. They are as follows:

a. grinding machine operator, automatic

b. stringing machine tender (textile & bag industry)

c. laminator (leather industry)

d. label pinker (fabrics)

e. umbrella tipper, machine.

Q. 3. Assume that the claimant cannot engage in work activity where he must be in frequent contact with others. Do the jobs enumerated by you above exist in settings where only minimal contact with others is required? If so, please enumerate which of the jobs fall into this category. Do they exist in significant numbers in the national economy? Does this also include the one handed jobs enumerated by you above? Again, please indicate if these exist in significant numbers in the national economy.

A. Yes. All of them. Yes. Yes. Yes.

## II.

### A.

In his opinion denying benefits, the ALJ reviewed the medical history, and concluded that, because appellant's basic work-related functions were restricted, his impairment must be considered severe. He next found that appellant's conditions did not meet or equal the "listings" contained in 20 C.F.R. Appendix I; hence, he could not be awarded disability on that basis. The ALJ then concluded that appellant was unable to return to his former job as an aid at a mental hospital. He therefore turned to the remaining issue of whether appellant had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy.

In this regard, the ALJ first determined that claimant's exertional impairment, while it restricted his ability to lift, did not affect manipulation or dexterity. Accordingly, he reached the conclusion that appellant could perform sedentary work, with a proviso, compelled by the psychiatric testimony, that the jobs be in settings where only minimal contacts with others were required. The ALJ then concluded that "claimant's emotional nonexertional problem does not affect his residual functional capacity for at least unskilled sedentary jobs. Thus even when his impairments are considered in combination it is concluded that disability cannot be established (20 C.F.R. 404.1522, 416.922 and S.S.R. 82–56)."

### B.

The ALJ's conclusion that appellant's nonexertional (psychiatric) limitation did not significantly affect his residual functional capacity for at least sedentary work is the salient conclusion for purposes of our review. In this regard, the ALJ relied primarily on the testimony of the vocational expert.[5] What the ALJ's conclusion ignores, however, is what the Secretary is apparently only now coming to focus upon: the problems that the mentally ill have in working in stressful and competitive situations.[6] That is precisely the problem here,

---

**5.** It is not entirely clear whether the ALJ decided this case on the "grids" or on the basis of the vocational expert's testimony. To the extent that the ALJ decided the case on the grids notwithstanding the fact that appellant plainly suffers from both exertional and nonexertional impairments, the ALJ violated the teaching of *Burnam v. Schweiker,* 682 F.2d 456 (3d Cir.1982). *See also Wallace v. Secretary of Health and Human Services,* 722 F.2d 1150, 1155 (3d Cir. 1983) (reliance on the grid is "inappropriate" when an individual suffers from both exertional and non-exertional impairments). However, inasmuch as the ALJ placed great reliance upon the testimony of the vocational expert, we will not decide this case based upon the putative *Burnam* problem.

**6.** Recently, *The New York Times* reported that "[t]he Administration has drafted new rules for the Social Security disability program that would liberalize the criteria for awarding bene-

for, in view of the evidence outlined in parts I.A and B., the outcome of this case turns upon the ability of the Secretary to prove, *see Rossi v. Califano, supra,* that appellant is able to perform work in a stressful competitive situation.

It is clear from this record that the Secretary has not met that burden. The medical evidence demonstrates almost beyond cavil that the appellant is still seriously mentally ill, and that he is not capable of functioning in a stressful or competitive environment. The evidence indicating that appellant is seriously mentally ill is very strong, while the critical witnesses relied upon by the Secretary, Dr. Shah and the vocational expert, established no more than a degree of uncertainty or doubt as to whether appellant could so function.[7] It is plain that the ability to perform work in a sheltered workshop or similar facility is no measure of the ability to work in a stressful or competitive situation and is not sufficient to meet the substantial gainful employment requirements of the Act. In sum, there is no substantial evidence on this record to support this Secretary's denial of benefits.

### C.

Plaintiff's medical history is long and well documented. This case has been before the ALJ two times. Despite the ample opportunity to do so, the Secretary has not been able to produce evidence that the appellant is able to work in a competitive environment. We held in *Podedworney v. Harris,* 745 F.2d 210 (3d Cir.1984), that this court will direct an award of benefits by the Secretary where the administrative record has been fully developed and sub-

stantial evidence on that record as a whole indicates that the claimant is disabled. That is the case here. Under the circumstances a third hearing "would simply prolong appellant's waiting and delay his ultimate receipt of benefits." *Id.* at 223. Accordingly, we will reverse the judgment of the district court and direct that the case be remanded to the Secretary with a direction that benefits be awarded.

---

fits to people with severe mental disabilities." *N.Y. Times,* Dec. 9, 1984, at 1. According to this report, under the proposed Rules, "disability determinations must be based not just on clinical findings by a physician but also on a realistic assessment of an individual's ability to work in a competitive situation." *Id.* Moreover, the proposed Rules reportedly state that "people who appear normal while taking medication or while living in a sheltered environment may be unable to work because their symptoms recur under the stress of a job." *Id.*

**7.** The vocational expert stated in her testimony that there is no assembly line job without stress or competition. To the extent that her answers to interrogatories contravened her position taken under oath, they must be disregarded. We note in this regard that appellant has suffered from schizophrenia. It has been noted that schizophrenia is a "devastating illness," and that "remissions" in the absence of an acknowledged "cure" are likely to be temporary only. *Morrone v. Secretary of Health, Education and Welfare,* 372 F.Supp. 794, 800 (E.D.Pa.1974).