Nisael ORTIZ,

v.

**Donna E. SHALALA, M.D., Secretary of Health and Human Services.**

Civ. A. No. 93–6378.

United States District Court, E.D. Pennsylvania.

June 16, 1994.

Lori L. Mannicci, The Law Offices of Frederick P. Rooney, Bethlehem, PA, for plaintiff.

Dorothea J. Lundelius, Sp. Asst. U.S. Atty., Health & Human Services, Region III, Philadelphia, PA, for defendant.

## MEMORANDUM

GILES, District Judge.

Nisael Ortiz brings this action pursuant to 42 U.S.C. § 405(g), for review of the final decision of the Secretary of Health and Human Services ("Secretary") denying his claim for supplemental security income benefits under Title XVI of the Social Security Act ("Act"). The parties have filed cross motions for summary judgment. For the following reasons, the plaintiff's motion is GRANTED and the defendant's motion is DENIED. Judgment is entered for the plaintiff and the decision of the Secretary is REVERSED.

## PROCEDURAL BACKGROUND

On March 22, 1991, Ortiz filed a claim with the Social Security Administration for Social Security Disability Benefits under the provisions of 20 C.F.R. Sections 404.900–404.906, alleging disability as of April 25, 1990 because of pain and complications following six surgical procedures performed on his bladder. After denials of his application, he filed a timely Request for Reconsideration, which was denied on or about July 23, 1991.

On July 30, 1991, Ortiz filed a timely request for a hearing before an Administrative Law Judge. On December 9, 1991, a preliminary hearing was held before the Honorable Robert S. Steiner. After hearing testimony from Ortiz and his wife, Onelia Ortiz, Judge Steiner vacated the prior adverse reconsideration determination and remanded the case for evaluation of a possible mental impairment.

On May 20, 1992, a Revised Reconsideration Determination was issued that denied Ortiz's application for benefits. Ortiz filed a timely Request for a Hearing, and appeared before the Honorable George C. Yatron on October 5, 1992. Judge Yatron determined that Ortiz was not disabled within the meaning of the Social Security Act. On October 21, 1993, the Appeals Council denied Ortiz's timely Request for Review of the ALJ's determination. Ortiz filed an appeal in the district court pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1383(c)(3).

## FACTS

Nisael Ortiz was born in Puerto Rico on April 11, 1963. At the time of his administrative hearing he was 29 years old, making him a "younger person" under the Social

Security Regulations, 20 C.F.R. Sections 404.1563(b), 416.964(b). He has a high school education and vocational training as a welder. The record indicates that he is unable to read and write in English and does not speak it proficiently (R. 11).

Until January of 1991, when Ortiz had his first surgical procedure, he was employed in a variety of positions at the medium to heavy exertional levels, including jobs as an industrial laundry machine operator, a loading dock worker for the U.S. Postal Service, a welder, a pipe caster and a fruit picker. (R. 111–27, 132). Ortiz experienced failing health during much of his employment history and was forced to stop working on January 18, 1991. Ortiz testified that he became disabled due to constant pain in his waist, bleeding upon urination, impotence, swelling of the legs and testicles, diarrhea, constipation, urinary incontinence, pain with sitting, standing, and walking and hemorrhoids. Ortiz also suffers from depression, allegedly related to his medical problems. (R. 11–13, 128).

Due to the pain he was experiencing, Ortiz was admitted to St. Luke's Hospital for a "cystoscopy," a surgical procedure for examining the bladder and urethra. Suspecting a tumor in his bladder because of the type and location of Ortiz's extreme pain, the surgeons also performed a biopsy. In an April 14, 1991 letter, Dr. Gadbois, a urologist at St. Luke's, stated that the cystoscopy "revealed an angry, apparently malignant bladder tumor occupying the hemi-trigone of the bladder extending posteriorly up along the bladder wall." He stated that Ortiz's symptoms were "almost incapacitating in nature" and referred him to Dr. Allen Wein, Chairman of Urology at the Hospital of the University of Pennsylvania.

On October 16, 1990 Ortiz was again admitted to the hospital because of continuing cystitis and voiding dysfunction. He underwent a second cystoscopy and bladder biopsy and a postoperative "endoscopy," which revealed inflammation. Additionally, his urine was red, indicative of clot retention. Ortiz underwent some corrective procedures and was released on October 21. Three months later, a third cystoscopy was performed along with multiple biopsies and bladder washings. After being released on January 31, he continued to experience void dysfunction, pain and constipation. A fourth cystoscopy was performed at the Hospital of the University of Pennsylvania and Ortiz was diagnosed with "cystitis glandularis."

In correspondence dated April 23, 1991, Dr. Wein, Ortiz's treating physician, stated that Ortiz had been "disabled because of a voiding dysfunction secondary to cystitis glandularis since approximately January 18, 1991" and that since he was "voiding up to 3–4X in an hour ... he [would have] great difficulty holding down any sort of job." In a May 2 note he repeated his belief that Ortiz was disabled. In correspondence dated June 18, 1991, Dr. Gadbois noted that according to Dr. Wein the "appearance of his bladder was considerably better," and asserted that "it is difficult for me to comment on whether he is still disabled." (R. 179). However, he acknowledged that he had not personally examined Ortiz since April 4. He also stated that Ortiz was still experiencing "considerable bilateral inguinal discomfort."

Still experiencing great discomfort, Ortiz was examined by Dr. Dale Weisman on July 1, 1991. Dr. Weisman noted that the nature of his medical problems was complicated and had been ongoing, including "constant lower abdominal pain, pain with voiding, hematuria, difficulty with erection, painful intercourse, frequent bladder infections and constant pain in the testicles especially when standing or walking." (R. 180–81). It appeared that Ortiz suffered from "benign proliferative cystitis," a form of benign tumor. Dr. Weisman's assessment was "chronic cystitis etiology unknown, anxiety and depression." (R. 181).

In correspondence dated July 10, 1991, Dr. Wein stated that Ortiz's conditions were virtually unchanged since his April 23 letter, except that he was now voiding two times an hour and four or five times at night. He added that "[h]e is therefore, in my opinion, still disabled and I do not [know] whether he is temporarily disabled or whether this is a permanent condition." (R. 183).

On December 16, 1991, Ortiz was once again admitted to the hospital, where he underwent a continent urinary diversion and a bowel anastomose. His bladder was removed and a "pouch bladder" was created from part of his intestine. According to the AMERICAN MEDICAL ASSOCIATION ENCYCLOPEDIA OF MEDICINE, this procedure is still experimental and usually results in impotence, as it did in Ortiz's case. Ortiz felt better for a couple of months, during which a suture line leak was surgically corrected. However, on February 4, 1992, he was again admitted to the hospital with a diagnosis of "Pouch leak, status post hemi Cope to the urethra" and "History of cystitis glandularis and dysfunctional bladder...." (R. 234). Ortiz was hospitalized for the entire month of February, during which several "cystograms" were performed that revealed leakages of the pouch and attempts to drain it with a "Foley catheter." Ortiz was placed on antibiotics and released on March 2.

After his release from the hospital, Ortiz continued to suffer from pain in his groin, testicles, legs and lower back, although the urinary incontinence and bloody urine had improved. A November 6, 1992 report by Dr. Bruce Malkowicz, an associate of Dr. Wein's, indicated no specific limitations on Ortiz's ability to sit, stand or walk, but noted that he continued to suffer from residual perineal pain that was present preoperatively. Ortiz was referred to Wilhelmina C. Korevaar, M.D., a chronic pain specialist who examined Ortiz on January 27 and February 22, 1993. Dr. Korevaar noted that Ortiz "suffers from groin and leg pain due to a previous traumatic event with anterior functional unit spine disease at L5–S1." (R. 285). She also discovered "minimal disc bulging" at various point that she felt was "consistent with the chronic pain syndrome Mr. Ortiz has developed." (R. 287). On February 22, 1993, a "caudal epidural steroid injection" was administered that numbed some of the pain.

Throughout his numerous hospitalizations, Ortiz also experienced increasing depression about his impotence and inability to work. At his hearing before ALJ Steiner, the Judge requested that he get a psychological evaluation to determine if there were any possible mental impairments that would entitle him to disability benefits. To this end, he was examined by Ellen Goodman, Ed.D., a psychologist, on April 13, 1992. Dr. Goodman observed that Ortiz was "a thin, pale, depressed-looking" man who had little to say and "seemed too depressed and anxious to make any effort to speak at all." (R. 245). She also noted that he appeared to be experiencing physical discomfort while sitting.

With regard to his mental condition, Dr. Goodman noted that "Nisael's mood is so depressed that he has asked his wife to kill him to give him peace. He says he isn't going to live more than a year and that he will die in the summer." (R. 246). Dr. Goodman diagnosed Mr. Ortiz as suffering from "Adjustment Disorder with Anxious Mood and Depression," with a "guarded" prognosis, and asserted the following general impressions: (1) Intellectual potential probably low average. (2) Interferences: language handicap, poor concentration due to anxieties, learning problems. (3) Significant impairment in overall mental functioning. (R. 249).

In her "Psychiatric Activities Assessment" of May 1, 1992, Dr. Goodman noted that Ortiz had virtually no ability to sustain focused attention so as to complete tasks in a timely manner. For example, she stated that he was "No longer able to perform activities within a schedule ... physically or mentally," "No longer able to attend most tasks from beginning to end," "No longer able to sustain a work routine," "Not able to perform at a consistent pace. Requires frequent rest periods," and is "Dependent upon wife in decision-making situations." (R. 253). She added that he is "totally incapable of adapting to stressful work situations at this time," incapable of "handl[ing] conflicts under stressful or non-stressful circumstances," and "Unable to maintain regular attendance in a work situation under any circumstances." She expressed concern that he was "Too upset emotionally to be trusted to be aware of normal hazards and take precautions in a stressful work situation." (R. 254).

Ortiz was evaluated by David Behar, M.D., a psychiatrist on February 24, 1993, also at

the request of the Secretary. Dr. Behar diagnosed mild mental retardation and a "Dysthmic Disorder," observing a "shallow, narrow" affect and that Ortiz's "mood looks depressed." (R. 262). He also felt that Ortiz was in need of supervision "to prevent him from making any dangerous mistakes and hurting himself." *Id.* In a "Psychiatric Activities Assessment," Dr. Behar opined that Ortiz was completely dependent on his wife for all household chores, isolates himself socially, does not participate in any group activities besides Sunday mass, forgets instructions easily, loses track easily when attempting to complete a task, requires constant prompting in order to sustain a routine, is unable to perform at a consistent pace for more than ten minutes at a time, gets anxious and confused in response to change, withdraws from conflict, and has no concern for his personal safety. (R. 267–270).

In a March 10 "Medical Assessment of Ability to do Work–Related Activities (Mental)," Dr. Behar stated that Ortiz had a "fair ability" (defined as "seriously limited but not precluded") to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. (R. 263–640). He felt that Ortiz had no ability to use judgment or function independently.

Ortiz told neither Dr. Goodman nor Dr. Behar about his sexual dysfunction. However, his testimony at the October 5, 1992 hearing reveals that much of the depression was caused by his medical condition and the resulting impotence. He stated that he was depressed because he very much wanted children and would now be unable to impregnate his wife. This testimony is corroborated by that of his wife, Onelia Ortiz, who testified at both the December 9, 1991 and the October 5, 1992 hearings. Mrs. Ortiz testified that her husband's depression began just after his first surgery in April, 1990 and that from then on "he has been going in ... and out of depression." (R. 38). She stated that "Very many times he has told me he wants to ... disappear, he gets very depressed." She

testified that his depression manifests itself through anger and hyperactivity and added that she doesn't know "what to do with him, all I can do is pray. But he ... wants to [have a] ... family and I have the awful feeling sometimes that he wants to commit suicide." She also said that when he is depressed he stops eating, isolates himself, and refuses to talk to anyone. (R. 64).

Ortiz and his wife also testified as to the ongoing physical conditions upon which Ortiz bases disability, specifically pain in his waist and legs, bleeding upon urination, impotence, swelling of the legs and testicles, constipation, urinary incontinence, diarrhea, recurring hemorrhoids and pain with sitting, walking, and standing. He testified that his sleeping habits are "awful" because he cannot lie on his stomach due to pain and because he has to get up every two hours to use the bathroom. (R. 55). He wears adult diapers to bed because he wets the bed at least three times a week and "pus comes out." (R. 60–61). He also testified that he suffers from diarrhea three to four days a week, forcing him to use the bathroom approximately seven times a day for half an hour each time. If he is unable to use the bathroom every two hours, it becomes very painful. Finally, Ortiz and his wife testified that he is unable to dress himself because of difficulty bending over, that he can help his wife with shopping for groceries only for short periods of time, but that he helps wash the dishes.

Vocational Expert ("VE") Mark Lukas testified at the hearing. His role was to identify whether an individual with a work, education and medical history similar to that of Ortiz could perform any substantial gainful activity and, if so, whether those positions were available in significant numbers in the national and regional economy. Lukas characterized Ortiz's past relevant work as a machine operator and material handler as unskilled, at the medium to heavy exertional level and his work as a welder as skilled to semi-skilled, at a medium exertional level. In response to a hypothetical from Judge Yatron, Lukas testified that if Ortiz was required to urinate every two hours and/or had diarrhea three times a week which required

him to use the bathroom approximately seven times a day for half an hour each time, these absences from the work station would be an "adverse vocational factor." (R. 71–72). If a worker were required to leave his or her work station for even three half hour intervals, "that would be intolerable" because it would "not even allow for a full day of work activity." Combined with medication that causes drowsiness, such as that being taken by Ortiz, this would be another "negative vocational factor." No hypotheticals were posed involving the totality of Ortiz's mental and physical limitations.

## STANDARD OF REVIEW

 Review of the final decision of the Secretary is limited to a determination of whether that decision is supported by substantial evidence. *Brown v. Bowen,* 845 F.2d 1211 (3d Cir.1988). Substantial evidence has been defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." *Woody v. Secretary of Health and Human Services,* 859 F.2d 1156, 1159 (3d Cir.1988).

 Additionally, the third circuit has held that an ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis of the decision." *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981). In addition to evidence supporting the result, it is essential that the ALJ's statement include "some indication of the evidence which was rejected." *Id.* There is a particularly acute need for explanation when relevant evidence has been rejected or when there is conflicting evidence in the record. *Id.* at 706. The third circuit requires that an ALJ do more than simply state ultimate factual conclusions. *Stewart v. Secretary of Health, Education & Welfare,* 714 F.2d 287 (3d Cir.1983).

## ALJ'S FINDINGS

In a decision dated May 21, 1993, the ALJ concluded that Ortiz's depression and anxiety were accompanied by clinical findings sufficient to meet the requirements of § 12.04(A) of the Listing of Impairments, in that he suffered from an Adjustment Disorder, but were insufficient to meet the criteria of § 12.02(B).

The ALJ found that while Ortiz suffered from severe impairments, he retained the residual functional capacity to perform a limited range of work and that there were a significant number of jobs in the national and regional economy available. He added that Ortiz's ability to perform at a job is "reduced by restrictions on constant standing or walking, deep bending, exposure to temperature extremes or tolerance of job complexity or stress." (R. 19). Furthermore, he found that

> The claimant's statements regarding the nature and severity of his impairments and the extent of his functional limitations are credible, and are consistent with objective medical findings, except to the extent that he alleges that his symptoms of abdominal, testicular, and leg pain, along with urinary frequency and diarrhea, prevent him from performing all substantial gainful activity....

Regarding Ortiz's mental condition, the ALJ rejected the results of the IQ test given by Dr. Goodman, believing it invalid because it was administered though his wife as interpreter. However, he cited her observations regarding his anxiety and depression, as well as the "substantial restrictions on concentration and task persistence and on adaptation to stressful circumstances, and significant restrictions on activities of daily living and social functioning...." (R. 16). The ALJ summarized Dr. Behar's findings as being that "the claimant has a fair ability to make occupational, performance, and personal/social adjustments, could understand, remember, and carry out simple job instructions well." *Id.* Overall, the ALJ concluded that Ortiz has "difficulty coping with pain, impotence and urinary frequency, and he should avoid complex or detailed job tasks and work

environments involving high levels of stress," (R. 17), but that jobs existed in the national or regional economy that he could perform.

*DISCUSSION*

In determining whether an individual is entitled to disability benefits, the Secretary must consider the following factors, in order:

1. Whether the plaintiff is working;
2. Whether the plaintiff has a serious impairment;
3. Whether the plaintiff has an impairment that meets or equals the requirements of a listed impairment;
4. Whether the plaintiff can return to his past relevant work; and
5. If not, whether the plaintiff can perform other work.

20 C.F.R. § 416.920 (1993). *See, generally, Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

■ Ortiz argues that the ALJ erred in his determination that he did not meet or equal a Listing of Impairments in Subpart P of Regulation 4. 20 C.F.R. Part 404, Subpt. P.App. 1. Specifically, he asserts that the ALJ failed to consider the medical records and statements of Dr. Goodman and Dr. Behar and the testimony of Ortiz and his wife in his finding that Ortiz's mental impairment, while severe, did not result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace resulting infrequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes or deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

The court agrees with Ortiz's contention. The evidence presented by the medical reports of Dr. Goodman and Dr. Behar as well as the testimony of Ortiz and his wife clearly illustrate that his "functional abilities" as defined by the categories listed above preclude him from performing any type of work. Dr. Goodman's findings were that Ortiz is unable to get dressed without his wife's assistance; that he is extremely depressed and anxious, perhaps even suicidal; that he is not able to perform activities within a schedule; that he is not able to sustain work routine. Dr. Goodman also noted that he is almost completely dependent upon his wife and that he is too emotionally unstable to be trusted to take precautions in the workplace. Dr. Behar diagnosed Ortiz as suffering from a "Dysthymic Disorder" and depression. He felt that Ortiz was in need of constant supervision to prevent him from hurting himself and had no ability to use judgment or function independently. Finally, Dr. Behar noted that Ortiz was dependent on his wife for household chores, forgets instructions easily, has difficulty sustaining a routine without prompting, and is unable to perform at a consistent pace for more than ten minutes.

The court disagrees with the Secretary's contention that the ALJ's decision is supported by substantial evidence. The ALJ appears to rely on Dr. Goodman and Dr. Behar to the extent that they indicate that Ortiz has a mental impairment. However, he does not cite to any findings that could lead him to conclude that the List of Impairments is not met. Indeed, the ALJ completely disregarded Dr. Goodman's determinations as to Ortiz's inability to function in daily living with no explanation or medical findings to the contrary. Similarly, the ALJ simply ignored the findings of Dr. Behar as to Ortiz's dependency or inability to do daily tasks and overall put very little weight on his mental impairment. However, as noted above, the third circuit requires that an ALJ do more than simply state ultimate factual conclusions. *Stewart v. Secretary of Health, Education & Welfare,* 714 F.2d 287 (3d Cir. 1983). Rather, the ALJ has a particular responsibility to identify relevant evidence that has been rejected and to explain the reasons. *Cotter v. Harris, supra,* at 705. The ALJ has failed to do so in this case and there is significant evidence on the record

250

that Ortiz satisfies at least two of the Part B criteria.

 Ortiz also argues that even if the court finds that there is substantial evidence that his condition does not meet or equal a Listing of Impairment, the Secretary failed to consider the totality of the evidence with regard to the severity of his impairments and the limiting effect upon his ability to function effectively and independently. The court agrees. The medical evidence shows that Ortiz suffers not only from a severe mental impairment, but also from constant pain in his waist, bleeding upon urination, swelling of the legs and testicles, pain with sitting, standing and walking, the need to urinate every two hours and diarrhea three times a week for which he must use the bathroom approximately seven times a day. In both the hypotheticals he posed to the VE and in his decision, the ALJ placed heavy weight on Ortiz's functional limitations due to urinary incontinence and subsequent bladder surgery from January 18, 1991 through July, 1991 and from December 19, 1991 through February, 1992. However, the ALJ ignored the periods of time from April 25, 1990 through December, 1990, August, 1991 through November, 1991 and March 1992 to the present with no explanation. However, the testimony of Ortiz and his wife and the medical evidence indicate that his physical condition has not improved much and his depression and anxiety have, in fact, worsened. The decision of the ALJ and the questions asked of the VE demonstrate that not all of the evidence was considered.

 The Secretary bears the burden of showing that the claimant has the ability to perform work in a stressful competitive situation. *Caffee v. Schweiker,* 752 F.2d 63 (3d Cir.). She must also demonstrate that the claimant retains the residual functional capacity to perform substantial gainful activity on a regular and continuing basis. *Brown v. Bowen,* 845 F.2d 1211 (3d Cir.1988); *Kangas v. Bowen,* 823 F.2d 775 (3d Cir.1987). Moreover, an ALJ's decision is "inadequate" when he refers to "that which might favor his determination and yet ignoring that which would clearly be adverse to his conclusions." *Roeder v. Bowen,* 1989 WL 86337 (E.D.Pa.

1989), No. 88–2645. The Secretary has failed, in this case, to meet her burden of proof that Ortiz is able to perform substantial gainful activity and the ALJ's decision must be reversed.